POTOMAC LEASING COMPANY *v.* BLUE CHIP EXPRESS, INC. ET AL.

(No. A8501336—Decided October 30, 1986.)

Court of Common Pleas of Hamilton County.

*Santen, Shaffer & Hughes* and *William E. Santen, Jr.,* for plaintiff.
*James G. Lutz,* for defendants.

BACON, J. The plaintiff, Potomac Leasing Company, a Delaware corporation, provides commercial credit to individuals seeking to acquire personal property for use in commercial or industrial enterprises. Indeed, plaintiff's change of name in 1986 more aptly describes the plaintiff's business, namely: Dana Commercial Credit Corporation.

As plaintiff's witness, Raymond Hahn, outlined the situation, when sellers of new commercial or industrial equipment (as in this case freight trailers for over-the-road hauling) find a customer for an individual unit or a fleet, his circumstances foreclosing the usual source of credit, such sellers consummate the sale by packaging the deal in the garb of a lease, resorting to corporations engaged in the business of financing buyers with limited credit.

Here, Hahn, Inc. desired to sell to its customer, Blue Chip Express, a corporation solely owned by its president, Donald Donovan, several van trailers newly manufactured by Trailmobile. The salesman, Raymond Hahn, stringed the bow by presenting to Donovan lease "packages" from the plaintiff (hereinafter "PLC"). By two separate transactions, PLC paid Hahn, Inc. the sum of $169,920 and took title to ten new trailers. PLC leased the ten units to Blue Chip Express. PLC demanded and obtained security for the performance by Blue Chip, namely a guaranty from Donald Donovan, individually, and a guaranty from Buckeye Valley Warehousing, Inc., the latter being another of Donovan's ventures.

The parties anticipated a lease for eighty-four months, Blue Chip promising to make eighty-four consecutive combined payments of $2,873.68. Shortly thereafter, however, the corporation and its entrepreneur encountered cash flow problems and defaulted in the rentals. Blue Chip had taken delivery of six units in April 1984 and four units in late May 1984. Only $13,427.93 had been paid upon the rentals prior to repossession by PLC in December 1984.

In early December, Blue Chip commenced delivery of the vans to the premises of Hahn, Inc. for the account of PLC, as each unit became available following discharge of cargo. Hahn's general manager, Tom L. Nolan, testified they were returned in fair to average condition. Although the repairs were never made, PLC engaged Underwriters Adjustment Company to estimate the repairs to put the units "back into NEW condition."

Such not being feasible, Steve Crawford, UAC's appraiser, made his estimate on the basis of "a quality job" to make the vans look good and sell at a premium price. Crawford did not testify. His appraisal was admitted without objection. But, as the repairs were never made, the significance of his estimate is lost upon the author of this opinion.

The seller's general manager, Tom Nolan, has been with Hahn, Inc. in various capacities for twenty-five years, with eighteen years' experience in appraising semis and trailers of all types. From personal observation it was his opinion that the ten trailers delivered new in the spring of 1984 at $16,992 each should bring as of January 23, 1985 from $13,500 to $14,000 per unit.

On March 5, 1985, PLC sold the ten Trailmobile van trailers for a total of $115,000 to Castellini Co., d.b.a. Truckway Leasing, under a bid higher than that made by Hahn, Inc.

The obligations of Blue Chip, as well as those of the guarantors, Buckeye Valley Warehousing, Inc. and Donald Donovan, are set forth in several pages of fine print. They are contracts of adhesion. The pertinent provisions in the leases are contained in eighteen paragraphs, many of considerable length, PLC having designed its form to cover both mobile and immobile personalty.

There is no evidence of performance of the contract following delivery of the trailer vans to Blue Chip, other than default by the lessee in the payment of rentals. Thereupon, however, PLC had the right to (1) retake immediate possession of its equipment, and at its option, sell the equipment at public or private sale for cash or credit and even become the purchaser at such sale, "and/or" (2) accelerate the balance of rentals and other sums payable thereunder.

A more complete delineation of the lessors' rights upon a default are set forth in paragraph 11 of the lease documents, which also provides that the dual rights so granted are cumulative and action upon one shall not preclude action upon the other. The plaintiff computed its damages by reason of default in the payment of rentals, *viz.*:

| | |
|---|---|
| Rentals accrued and unaccrued | $250,000.92 (accelerated) |
| Less rentals paid | 13,238.93 |
| | $236,761.99 |
| "Early return" | 98,000.00 |
| | $334,761.99 |
| Less proceeds of "Resale" | 115,000.00 |
| Judgments demanded | $219,761.99 |

The sum of $98,000, "Early return," appears to be the addition by plaintiff's counsel of the charge for the estimate by UAC, $838.42, a towing charge of $150, and the "grand total" of the UAC estimate, $16,046.89, and deducting the result from the proceeds of the sale to Castinelli, $115,000. However, if the court understood the testimony correctly, the repairs were never made and the estimate was thus superfluous. The towing charge seems to be the result of a lack of communication from the plaintiff to the defendant, Donovan, who was willing to and did deliver the trailer units to Hahn, Inc. for plaintiff's benefit. It should be disallowed.

PLC urges, then, that it is entitled to accelerate the eighty-four contracted payments, computed by plaintiff (less credits) to be $236,761.99 plus $98,000 (value of the van trailers upon "early return") to arrive at the sum of $334,761.99. PLC would credit the defendants with proceeds of the Castellini sale, $115,000. Thus PLC demands judgment in the sum of $219,761.99.

The loss PLC sustained by Blue Chip's default cannot be assessed in that manner. The authorities are virtually uniform that the lessor cannot accelerate the unpaid installments and at the same time repossess the equipment. PLC cannot expect full performance by the lessee when repossession deprives the lessee of the use of the very property, as anticipated, which use would largely enable the lessee to meet that very obligation. The Court of Appeals for Cuyahoga County in *Frank Nero Auto Lease* v. *Townsend* (1979), 64 Ohio App. 2d 65, 18 O.O. 3d 44, 411 N.E. 2d 507, supports this conclusion.

The *Townsend* case was reviewed in one of the court's later opinions, *Master Lease of Ohio, Inc.* v. *Andrews* (1984), 20 Ohio App. 3d 217, 20 OBR 264, 485 N.E. 2d 820, and expressly approved. The provisions of the lease in the instant case more readily accord with those of *Townsend.*

The *Andrews* case recognizes that under traditional contract principles the loss for lessee's breach of the lease is the value of the bargain thereby lost by the lessor. Ideally, the lessor would mitigate his damages by finding another lessee, and the difference between the rentals, providing the lessor has acted reasonably, would be the measure of damages. However, in the case of the lease of personalty, such a solution is rarely attainable. This is particularly so in the instant case where the transaction was really an extension of credit to a buyer and the lessor is not actually in the business of offering van trailers for rent.

Principles of bailment do not appear as fully explored in the law reviews as have other areas of the law. But, as mentioned, the bailment authorities do not contemplate that unaccrued rentals can be accelerated if the lessor retakes possession. In such a case, principles of the law on commercial credit are more appropriate guidelines in assessing loss for a bailee's breach of the contract of bailment for the hire of chattels. Finding that repossession has operated as a penalty, the court endeavors to arrive at the loss sustained under the facts, using ten percent as an interest factor.

The court finds that PLC originally advanced $169,920 on behalf of Blue Chip Express. Considering the rentals paid and interest to which PLC was entitled, the "principal" would have been reduced by $4,000 by the time of repossession. The court considers that PLC disposed of the "collateral" in a reasonably prudent manner. The sale to Castellini is approved. Deducting the proceeds, $115,000 from $165,920, the court fixes plaintiff's loss in the sum of $50,920. The court disallows the appraisal fee and towing charge. Allowing $16,046.89 for repairs never made is inappropriate. The guaranty agreements are valid. The plaintiff is entitled to recover from the defendants and each of them the sum of $50,920.

*Judgment for plaintiff.*